25-1378
*Asinga v. Gatorade Co.*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2025

(Argued: December 16, 2025 Decided: July 17, 2026)

Docket No. 25-1378

ISSAMADE ASINGA,

*Plaintiff-Appellant*,

–v.–

THE GATORADE COMPANY, A DIVISION OF PEPSICO, INC.,

*Defendant-Appellee*.

Before: LOHIER, *Chief Judge*, JACOBS, and CABRANES, *Circuit Judges*.

Plaintiff-Appellant Issamade Asinga appeals from an order of the United States District Court for the Southern District of New York (Seibel, *J.*) dismissing his claims that The Gatorade Company ("Gatorade") wrongfully caused him to ingest a banned substance

CERTIFIED COPY ISSUED ON 07/17/2026

that disqualified him from elite track and field participation. Asinga alleges that the detectable change in his body chemistry caused a host of economic impacts on his education and on his career as an elite professional athlete. The district court invoked the "economic loss doctrine," under which economic harms, absent an injury to person or property, should be resolved in contract, rather than tort; and since Asinga's unwanted bodily change was undetectable except by testing, the district court dismissed the tort claims. The New York Court of Appeals has yet to decide how an unwanted bodily change of this nature (undetectable without laboratory testing) and its consequences (capable of competitively running but ineligible to compete) should be regarded under tort law. We thus defer decision and **CERTIFY** two questions of state law to the New York Court of Appeals:

> (1) Does any doctrine of New York law bar a tort claim as duplicative of contract or products liability claims if there is no viable claim under contract or products liability?
>
> (2) Does the nonconsensual ingestion of a substance that affects eligibility to compete amount to an athlete's cognizable injury in tort, when consumed in reliance on a false representation that the product containing the substance had been independently tested for and certified as uncontaminated with that substance?

---

ALEXIS G. CHARDON, Garmey Law, Portland, ME, *for Plaintiff-Appellant*.

JESSICA ELLSWORTH, Hogan Lovells US LLP, Washington, DC (Michael J. West, Washington, DC; Lauren S. Colton, Baltimore, MD; Benjamin A. Fleming, New York, NY, *on the brief*), *for Defendant-Appellee*.

---

DENNIS JACOBS, *Circuit Judge*:

Plaintiff-Appellant Issamade Asinga appeals from an order of the United States District Court for the Southern District of New York (Seibel, *J.*) dismissing his claims that The Gatorade Company ("Gatorade") wrongfully caused him to ingest a banned substance that disqualified him from elite track and field participation. Asinga alleges that the detectable change in his body chemistry caused a host of economic impacts on his education and on his career as an elite professional athlete. The district court invoked the "economic loss doctrine," under which economic harms, absent an injury to person or property, should be resolved in contract, rather than tort;

and since Asinga's unwanted bodily change was undetectable except by testing, the district court dismissed the tort claims. The New York Court of Appeals has yet to decide how an unwanted bodily change of this nature (undetectable without laboratory testing) and its consequences (capable of competitively running but ineligible to compete) should be regarded under tort law. We thus defer decision and **CERTIFY** two questions of state law to the New York Court of Appeals:

> (1) Does any doctrine of New York law bar a tort claim as duplicative of contract or products liability claims if there is no viable claim under contract or products liability?
>
> (2) Does the nonconsensual ingestion of a substance that affects eligibility to compete amount to an athlete's cognizable injury in tort, when consumed in reliance on a false representation that the product containing the substance had been independently tested for and certified as uncontaminated with that substance?

## BACKGROUND

### I. Asinga's Allegations[1]

In 2023, Asinga was a world-class high school track and field athlete who set record-breaking sprint times. In recognition of his athletic feats and public appeal, Gatorade selected Asinga to receive its 2022–23 National Player of the Year Award in boys' track and field, which is conferred on twelve high school student athletes exhibiting "athletic excellence, academic achievement, and exemplary character." App'x 14 (¶¶ 45–47). In July 2023 Gatorade flew the award winners, including Asinga, to Los Angeles for a ceremony where they each received a locker full of free Gatorade-branded products. Among these freebies was a bottle of Gatorade Recovery Gummies (the "gummies"), a supplement product designed to "support exercise recovery." App'x 16 (¶¶ 54–55)

---

[1] The following background is from Asinga's Amended Complaint, located in the Judicial Appendix ("App'x"). We accept all factual allegations in the Amended Complaint as true. *K.W. ex rel. K.A. v. City of New York*, 177 F.4th 127, 141 (2d Cir. 2026).

(internal quotation marks omitted). The bottle displayed an NSF[2] "Certified for Sport" logo, which signifies that a product has been tested for—and does not contain—"any of 290 substances banned by major athletic organizations." App'x 16–17 (¶¶ 56–59) (internal quotation marks omitted). After confirming with his coach that the recovery gummies were "ok[ay] to eat" under the rules of his sport, Asinga began taking two gummies after his workouts beginning around July 11, 2023 and ending on or before July 25, 2023. App'x 19–20 (¶¶ 74–76).

On July 18, 2023, about one week after he started taking the gummies, Asinga provided a routine urine sample to the Athletics Integrity Unit ("AIU") to test for banned substances. AIU is the anti-doping enforcement arm of World Athletics, the federation overseeing the sport of track and field worldwide. On July 28, 2023,

[2] The National Sanitation Foundation (NSF) is a public health nonprofit organization that tests and certifies consumer products. NSF, *Who is NSF?* (Oct. 30, 2012), https://www.nsf.org/knowledge-library/who-is-nsf-international.

Asinga broke the under-20 world record for the 100 meters at a competition in Sao Paolo, Brazil. Also on July 28, Asinga again provided a sample for drug testing, which came back clean.

On August 9, 2023, Asinga was notified that his urine sample from July 18 tested positive for trace amounts of cardarine, an illegal performance-enhancing drug. Asinga was immediately suspended from competition. Asinga submitted for independent testing all supplements he had recently taken and discovered that the opened bottles of the gummies tested positive for cardarine in concentrations consistent with the cardarine levels found in his system. The AIU then directed Asinga to submit a sealed bottle of gummies from the same lot number for further testing.

When he attempted to purchase a sealed bottle of the gummies, Asinga discovered that they had been taken off the market several months before he had ever received them. Asinga contacted Gatorade directly to request a sealed bottle and was told

that Gatorade had discontinued the gummies due to "manufacturing issues." App'x 23–24 (¶¶ 98, 100) (internal quotation marks omitted). When the AIU contacted NSF, it turned out that the gummies from this lot number had never in fact been NSF Certified for Sport, and that the logo certification on the bottles was false. Emails between Gatorade and the gummy manufacturer reveal that Gatorade was aware before it gave the gummies to Asinga that the relevant lot had never been sent to NSF for testing and should not have been labeled as NSF Certified for Sport. In place of a bottle with the same lot number, Gatorade provided AIU with a bottle from a different lot but of the same batch, which tested negative for cardarine.[3]

[3] A "lot" is a subset of a batch; a lot "is uniform and [] is intended to meet specifications for identity, purity, strength, and composition; or, in the case of a dietary supplement produced by continuous process, a specific

After the bottle provided by Gatorade tested negative, AIU formally charged Asinga with a violation of the World Athletics Anti-Doping Rules.[4] As a result, Asinga was barred from competing in the 2024 Paris Olympics and 2023 and 2024 World Athletics Championships, was stripped of his world records, and lost his athletic scholarship to Texas A&M University and the opportunity for endorsement contracts.

In June 2024 Gatorade informed the AIU that it had located a sealed bottle of the gummies from the same gummies lot as the one Asinga had received. The gummies in this bottle tested negative for cardarine. The gummies from his original opened bottles—the same

identified amount produced in a specified unit of time or quantity in a manner that is uniform and that is intended to meet specifications for identity, purity, strength, and composition." 21 CFR § 111.3. Asinga therefore alleges that by definition, a bottle from the same batch but a different lot was not subject to identical conditions that caused the first bottle to be contaminated.

[4] That decision was on appeal before the Court of Arbitration for Sport as of the filing of Asinga's Amended Complaint.

gummies that had tested positive for cardarine just over six months earlier—were then retested. The retested gummies showed no traces of cardarine, suggesting to Asinga that the passage of time had rendered the drug undetectable.

## II. Procedural History

Asinga filed this action in the Southern District of New York. His Amended Complaint asserted claims for (1) strict products liability, (2) negligence, (3) negligent misrepresentation, (4) violation of Texas's Deceptive and Unfair Trade Practices Acts (Texas Business and Commercial Code § 17.46), (5) tortious interference with contract, and (6) intentional infliction of emotional distress ("IIED"). Asinga alleged injury from the impact of cardarine on his body and his ability to compete in his sport, causing lost wages and opportunity, emotional anguish, and legal expense. Gatorade moved to dismiss all six of Asinga's claims.

On April 28, 2025, the district court granted Gatorade's motion to dismiss the case in its entirety. The claims for strict liability, negligence, and negligent misrepresentation were held to be barred because Asinga failed to allege a "cognizable injury outside of purely economic damages." App'x 142–47. Applying New York law, the district court found that Asinga's allegations amounted to injury only in the form of "damages . . . from nonperformance" of a "defective product" (the gummies), and that any "physical change [from] the presence of the substance in Plaintiff's blood" did not "mold his allegations into a personal injury claim." App'x 142–43. The claim for tortious interference with contract was dismissed because the alleged tortious conduct by Gatorade (inhibiting the AIU investigation) occurred *after* Asinga allegedly breached his contracts with Texas A&M and AIU by ingesting a banned substance. The claim for violation of the Texas Deceptive Trade Practices Act (TDTPA) was dismissed because

Asinga is not a "consumer" under the statute, Tex. Bus. & Com. Code § 17.46, having received the gummies as a gift. Finally, the IIED claim was dismissed because the allegations against Gatorade did not amount to extreme and outrageous conduct with intent to cause extreme emotional harm, and because Asinga did not allege severe emotional distress. Asinga appeals the dismissal of all six claims.

By summary order accompanying this opinion, we affirm the dismissal of Asinga's tortious interference with contract, TDTPA, and IIED claims.

## DISCUSSION

### I. Standard of Review and Choice of Law

This Court "review[s] *de novo* a district court's dismissal" of claims under Rule 12(b)(6). *Buon v. Spindler*, 65 F.4th 64, 76 (2d Cir. 2023). A district court's legal conclusions, as well as the court's choice of law, are likewise reviewed *de novo*. *See City of Pontiac Gen.*

*Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011) (legal conclusions); *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (choice of law).

Asinga conceded in the district court that New York law applies, but argued that Texas or Florida laws could also apply. He now argues that dismissal of his claims needs to be evaluated under the law of all three States.

A court sitting in diversity jurisdiction applies the choice of law principles of the forum state. *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018). "Under New York's conflict of laws approach, . . . '[t]he first step . . . is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'" *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006) (alteration in original) (quoting *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993)). A conflict exists if "the applicable law from each jurisdiction provides different substantive rules." *IBM Corp. v. Liberty Mut. Ins.*

*Co.*, 363 F.3d 137, 143 (2d Cir. 2004) (citation omitted). If there is no conflict, and "New York law is among the relevant choices, New York courts are free to apply it." *Id.*

Asinga concedes that "no significant conflicts exist" between New York's laws and those of Texas and Florida for any claims. Appellant Br. at 21. Since he agrees that the "choice of law questions are not determinative," *id.*, we evaluate Asinga's claims solely under the law of New York.

## II. Economic Loss Doctrine

### *A. Defining Economic Loss Doctrine*

Asinga's strict liability, negligence, and negligent misrepresentation claims were all dismissed by the district court under the economic loss doctrine. The viability of these tort claims, which is unclear under New York law, is the remaining determinative issue of Asinga's appeal.

The "economic loss doctrine" is frequently invoked in New York state law, but it is rarely defined the same way twice.[5] According to the New York Court of Appeals, the economic loss *doctrine* is not a doctrine at all, but rather the "conflat[ion]" of two distinct but related principles: (1) the economic loss *rule*, and (2) the prohibition against duplicative contract and tort claims. *IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 40 N.Y.3d 277, 290 (2023).

The economic loss *rule* "stands for the proposition that an end-purchaser of a product is limited to contract remedies and may not seek damages in tort for economic loss against a manufacturer, and does not have application beyond the products liability context." *Id.* (internal quotation marks and citation omitted). Even within the products liability context, the rule is not uniformly applied. The

[5] *See, e.g.*, *Washington Apts., L.P. v. Oetiker, Inc.*, 978 N.Y.S.2d 731, 735 (N.Y. Sup. Ct. Erie Cnty. 2013), *New York Methodist Hosp. v. Carrier Corp.*, 892 N.Y.S.2d 110, 111 (2d Dep't 2009), *Weiss v. Polymer Plastics Corp.*, 802 N.Y.S.2d 174, 175 (2d Dep't 2005), *City of N. Tonawanda v. Penn Power Grp., LLC*, 254 N.Y.S.3d 798, 801 (4th Dep't 2026) (providing distinct definitions of the economic loss doctrine).

narrow view, expressed in New York's Practice Guide, is that economic loss "is that type of damages that occurs when a product fails to meet the expectations of a commercial customer, where the injury is only to the product itself, and where the only damages sought are replacement costs." 3 New York Practice Guide: Negligence § 29.12. But some New York courts describe the economic loss rule more broadly to say that the direct and consequential damages that may result from product nonperformance and from "defects related to the quality of the product . . . are not recoverable in tort." *Hemming v. Certainteed Corp.*, 468 N.Y.S.2d 789, 790 (4th Dep't 1983); *see also Amin Realty, LLC v. K & R Const. Corp.*, 762 N.Y.S.2d 92, 93 (2d Dep't 2003) ("[T]he economic loss rule is applicable to economic losses to the product itself, as well as consequential damages resulting from the defect.")

Although Gatorade conflates the economic loss rule and the economic loss doctrine, it substantively argues that Asinga's claims

are essentially product liability claims that should be analyzed under the economic loss rule. This argument finds support in the reasoning, endorsed by the Court of Appeals, that "whether pleaded in negligence or in strict liability, there can be no tort recovery in the case where a product, although not itself unduly dangerous, does not function properly, resulting in economic loss other than physical damage to persons or property." *La Barre v. Mitchell*, 681 N.Y.S.2d 653, 654 (4th Dep't 1998) (quoting *Schiavone*, 439 N.Y.S.2d at 938 (Silverman, *J.*, dissenting)); *Schiavone Constr. Co. v. Elgood Mayo Corp.*, 56 N.Y.2d 667, 668–69 (1982) (endorsing the reasoning "stated in the dissenting opinion" below).

For Asinga's part, to the extent the tort claims at issue are described in terms of negligence, not products liability, they do not fall squarely within the economic loss rule. But others, including his strict liability claim, may raise ramifications affected by the

economic loss rule.[6] His potentially viable claims are based on Gatorade's negligence in manufacturing contaminated gummies and in misrepresenting the gummies as independently tested for and certified as free from contamination to invited athletes participating in Gatorade's event, which caused Asinga to experience a nonconsensual change in his body chemistry and ultimately resulted in his being barred from competing.

As noted, the New York Court of Appeals instructs us to think of the "economic loss doctrine" as two distinct, inter-related concepts. In *IKB International*, German banks sought to recover

[6] Under the narrow view of the economic loss rule, Asinga's strict liability claim would not be barred because his alleged injuries are not "only to the product itself," and the "only damages sought are [not] replacement costs." 3 New York Practice Guide: Negligence § 29.12. But under the broader construction, his claim that the gummies did not perform as expected would not be recoverable in tort. *See* App'x 9, 28, 36. (Asinga's complaint alleging that Gatorade's product was "mislabeled," "defective," and did not conform with what the packaging "promised"); *supra* at 16-17. However, the application of this doctrine to Asinga's strict liability claim assumes that the economic loss rule applies even if Asinga has no viable products liability claim, as discussed *infra* at 21.

against trustees who issued residential mortgage-backed securities that became "essentially worthless" in the 2008 financial crisis. 40 N.Y.3d at 281–82 (internal quotation marks omitted). Although the courts below dismissed the claims under the economic loss doctrine, the Court of Appeals observed that "these courts appear to conflate our 'economic loss' rule with the prohibition against duplicative contract and tort claims." *Id.* at 290. The Court quickly rejected application of the economic loss rule to the contract and fiduciary duty claims because "this Court's 'economic loss' rule . . . *does not have application beyond the products liability context*." *Id.* (emphasis added and citation omitted).

A second, broader principle *IKB* identified is the preclusion of recovery in tort for claims that "are essentially contractual in nature." *5th Ave. Chocolatiere, Ltd. v. 540 Acquisition Co.*, 712 N.Y.S.2d 8, 11 (1st Dep't 2000); *see also IKB Int'l*, 40 N.Y.3d at 290. In concept, the doctrine "developed as a way of . . . preventing tort remedies

from eliminating the customary limitations involved in cases addressing the sale of goods." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 16 (2d Cir. 2000).

It was simple enough in *IKB* to identify the overlap between the tort and contract claims: the breach of contract and tort claims had "identical allegations," and the ultimate harm (the diminished value of the assets) was alleged "under the *guise* of separate claims." *IKB Int'l*, 40 N.Y.3d at 291–92 (emphasis added). But Asinga falls between stools; he has no viable claim in contract, and his consumer protection claim was properly dismissed under the DTPA because the gummies were received as a gift. Although historically a plaintiff need not have a viable contract law claim for losses to be contractual in nature,[7] the Court of Appeals instructed that "where plaintiff is essentially seeking enforcement of the bargain, the action

[7] *See Amin Realty*, 762 N.Y.S.2d at 92–93 (dismissing negligence and strict liability claims under economic loss doctrine and contract claims for a different reason); *County of Suffolk. v. Long Island Lighting*, 728 F.2d 52, 62–64 (2d Cir. 1984) (same).

should proceed under a contract theory." *IKB Int'l*, 40 N.Y.3d at 290 (citation omitted). With no enforceable "bargain" between Asinga and Gatorade, it is an open question of New York law how (or whether) to apply the doctrine.

*B. Defining Asinga's Injury*

*IKB*'s guidance on whether tort claims can be "duplicative" of nonexistent contract claims requires some thinking about Asinga's injury. "In determining whether claims are duplicative, we evaluate the nature of the injury, how the injury occurred and the harm it caused." *Id.* at 290–91 (cleaned up). The doctrine barring duplicative tort and contract claims overlaps and interacts with the economic loss rule; both seek to distinguish between losses that are "purely economic," *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 290 (3d Dep't 2001), versus those grounded in an injury to person or property, a necessary component of a

negligence or strict liability action, 1 New York Practice Guide: Negligence § 2.04.

Asinga's injury presents a challenge to the law. He alleges that the cardarine in his system rendered him ineligible to participate in his sport. This kind of injury is difficult to classify; the cardarine made it impossible for him to compete in his sport, without impairing his elite performance.

We know that the presence of the cardarine alone is not enough to allege personal injury in this case. Bodily injury is defined as "[p]hysical damage to a person's body." Bodily Injury, Black's Law Dictionary (12th ed. 2024) (noting that bodily injury is also referred to as personal injury). Although trace amounts of any harmful chemical could arguably be construed as "damage," district courts in this Circuit have dismissed cases grounded in

contamination exposure where the only adverse effects are on a future possibility.[8]

Asinga's claim is substantively about the immediate and downstream consequences on his career as a result of consuming gummies laced with a substance that Gatorade said was not there.[9] Those consequences did not impair Asinga's physical ability to run; he broke a world record approximately three weeks after he allegedly began consuming the gummies. The consequence was to his ability to compete as a champion. But allowing recovery in tort for a harm that is not a physical impairment raises a problem of

[8] *See, e.g.*, *In re Chantix (Varenicline) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 735 F. Supp. 3d 352, 406 (S.D.N.Y. 2024) ("Plaintiffs' allegations of harm based on mere exposure to nitrosamines, implicating future potential health consequences, are almost certainly insufficient to satisfy the physical injury exception to the economic loss doctrine.") (cleaned up); *Harris v. Pfizer Inc.*, 586 F. Supp. 3d 231, 237, 243 (S.D.N.Y. 2022) (dismissing a negligent misrepresentation claim involving "only economic harm, rather than personal injury," flowing from a product's contamination with a particular chemical above the legal limit).

[9] Asinga does, in passing, allege non-cognizable future risk of harm from the cardarine.

classification. If Asinga's alleged injury is, in fact, a physical one, the law must somehow distinguish him from the vegan who unwittingly ingests animal product.

In another context, the Court of Appeals has acknowledged a duty owed by entities who cause adverse drug test results, even absent physical injury. In *Landon v. Kroll Lab'y Specialists, Inc.*, a probationer's routine drug test came back positive for controlled substances. 22 N.Y.3d 1, 6 (2013). When Landon was taken into custody, and tested negative for those same substances, he sued the drug testing company, alleging that the false negative was caused by use of screening rates below the recommended cutoff level. *Id.* at 4–5. Although Landon alleged no physical injury from the test results, the Court of Appeals found that the lab owed a duty to those tested because "the release of a false positive report will have profound, potentially life-altering, consequences for a test subject." *Id.* at 6. That duty flowed from "strong policy-based considerations,"

including that the "laboratory is . . . in the best position to prevent false positive results" and that "there is no apparent statutory remedy for a victim of negligence whose injury was caused by a false positive drug test." *Id.* at 4, 6–8. Arguably, Asinga likewise suffered "profound, potentially life-altering, consequences" from the contamination in his system—loss of his scholarship, ineligibility to run in college or professional competitions, and the stripping of his world records.

Moreover, Asinga claims to have relied on the labelling of the gummies as NSF Certified for Sport, which would signify that the gummies had been "independently tested and confirmed to be free from any of the illegal banned substances and doping agents listed on the World Anti-Doping Agency's ('WADA') Prohibited Substances List." App'x 9 (¶ 8). Gatorade allegedly used the NSF Certified for Sport seal without authorization because the gummies at issue had not been tested. There is authority in New York that

suggests that a certification to induce action may give rise to a special duty, *see Glanzer v. Shepard*, 233 N.Y. 236, 238–242 (1922), or (more generally) when there is "an affirmative assumption of a duty of care to a specific party, for a specific purpose, regardless of whether there was a contractual relationship," *Credit All. Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 548–49 (1985). These cases seem to permit recovery for purely economic losses based on negligent misrepresentation. Because Gatorade offered the gummies falsely labelled as certified to participating athletes at an invitational event and was "aware" of and "intended" for the athletes to rely on the certification in choosing whether to consume the gummies, *id.* at 551, Gatorade may have placed itself in the "best position" to prevent athlete contamination, *Landon*, 22 N.Y.3d at 6.

Still, Gatorade is not a lab like the defendant in *Landon*, so Gatorade may not have been in the "best position" to prevent adverse drug test results, merely a step along the way. *See id.*

Regardless of duty, there is a question as to whether Asinga has alleged an injury to person or property sufficient to support a claim, *Greco v. Nat'l Transp. Co.*, 222 N.Y.S.2d 145, 146 (1st Dep't 1961); and the impact of false imprisonment from a drug test is distinct from and possibly incommensurate with the loss of career opportunities, *see Landon*, 22 N.Y.3d at 4–6. It is thus unclear on these facts whether and how economic losses must be parasitic on some other form of compensable and cognizable harm, even assuming Gatorade assumed some special duty.

### *C. Economic Loss in* Horn v. Medical Marijuana

As to whether Asinga suffered a personal injury, both parties claim support from decisions rendered in *Horn v. Med. Marijuana, Inc.* by the Supreme Court, this Court, and the district court. *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593 (2025); *Horn v. Med. Marijuana, Inc.*, 80 F.4th 130 (2d Cir. 2023); *Horn v. Med. Marijuana, Inc.*, 383 F. Supp. 3d 114 (W.D.N.Y. 2019). But the *Horn* case yields no clarity on

how the New York Court of Appeals would define this injury. Horn lost his job as a commercial truck driver after a random drug test detected tetrahydrocannabinol ("THC"). *Horn*, 604 U.S. at 597–98. He alleged that he ingested THC unwittingly by consuming a cannabis-derived product that was marketed as THC-free by the defendant distributors and manufacturers. *Id.* at 597. Horn brought federal and state law claims that included negligence and strict products liability claims. 383 F. Supp. 3d 114, 135 (W.D.N.Y. 2019). The Western District of New York ruled that the economic loss doctrine barred the tort claims because "Plaintiffs seek damages for their economic losses, but they do not claim that they suffered any personal injury or injury to property as a result of Defendants' conduct." *Id.* at 134. The appellate challenge on that issue was dismissed because Horn failed to file an accompanying brief, so this Court did not weigh in on that application of the economic loss

doctrine. 19-1437, *Horn v. Med. Marijuana, Inc.*, Order dated Oct. 25, 2019.

In a subsequent decision, the district court ruled on summary judgment that Horn lacked RICO standing because he sued for losses (in particular, his loss of earnings) that were derivative of, or flowed from, an antecedent personal injury. 2021 WL 4173195, at *5 (W.D.N.Y. Sept. 14, 2021). Reversing, this Court observed that the exclusion of a RICO "recovery for personal injury does not mean that a plaintiff cannot sue for injuries to business or property simply because they flow from, or are derivative of, a personal injury." 80 F.4th at 138. The Supreme Court affirmed, holding that under RICO, "a plaintiff can seek damages for business or property loss regardless of whether the loss resulted from a personal injury." *Med. Marijuana, Inc. v. Horn*, 604 U.S. at 601.

Asinga argues that he (like Horn) suffered an "antecedent personal injury" by ingesting a substance unknowingly that caused

him to fail a drug test and suffer further harms. Appellant Br. 28–29 (citing 80 F.4th at 143 and 604 U.S. at 599). But *Horn* is not predictive because this Court and the Supreme Court were evaluating the definition of "economic injury" under federal RICO—not under New York law. *Horn*, 80 F.4th at 138 ("At its core, civil RICO was 'designed to remedy *economic* injury,'" and Horn suffered economic injuries that flowed from a personal injury.) (quoting *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 151 (1987)).

Gatorade's argument on *Horn* fares no better because the dismissal under the economic loss doctrine was based on the same New York caselaw that (as discussed *supra* at 15-17) provides a conflicting characterization of the doctrine. 383 F. Supp. 3d at 134 (citing cases referring to economic losses as "the cost of repair and consequential damages" or as "the direct and consequential

damages which may result from product nonperformance"[10] (internal quotation marks omitted)). In short, *Horn* does not assist prediction of how the New York Court of Appeals would regard Asinga's injuries under traditional tort recovery.

## III. Certification

"We may certify a question to the New York Court of Appeals where that court has not spoken clearly on an issue and we are unable to predict, based on other decisions by New York courts, how the Court of Appeals would answer a certain question." *Beck v. Manhattan Coll.*, 136 F.4th 19, 24 (2d Cir. 2025), *certified question accepted*, 43 N.Y.3d 983 (2025), and *certified question withdrawn*, 44 N.Y.3d 943 (2025) (quoting *Ortiz v. Ciox Health LLC*, 961 F.3d 155, 158–59 (2d Cir. 2020)). In deciding whether to certify a question to

[10] *Am. Tel. & Tel. Co. v. N.Y.C. Human Res. Admin.*, 833 F. Supp. 962, 982 (S.D.N.Y. 1993) (citing *Mid-Hudson Mack, Inc. v. Dutchess Quarry & Supply Co.*, 471 N.Y.S.2d 664, 666 (2d Dep't 1984) and *Hemming*, 468 N.Y.S.2d at 790 (4th Dep't 1983)); *see also Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 532 (S.D.N.Y. 2007).

the New York Court of Appeals, "we consider three questions: (1) whether there are authoritative state court [decisions]; (2) whether the issue is important to a state policy; and (3) whether certification can resolve the appeal." *Nitkewicz v. Lincoln Life & Ann. Co. of N.Y.*, 49 F.4th 721, 729 (2d Cir. 2022) (per curiam) *certified question accepted sub nom. Nitkewicz v. Lincoln Life & Annuity Co. of N.Y.*, 39 N.Y.3d 927 (2022), and *certified question answered*, 40 N.Y.3d 349 (2023) (internal quotation marks omitted). Answers to these questions counsel in favor of certification.

(1) The scope of the economic loss bar under New York law is wholly unclear doctrine (if it is a doctrine at all), and Asinga's injury lacks any useful analog in precedent. It is therefore difficult to "predict with confidence how the New York Court of Appeals would" resolve the case before us. *Barenboim v. Starbucks Corp.*, 698 F.3d 104, 117 (2d Cir. 2012).

(2) Although Asinga's circumstances are likely unusual, questions of how to regard his injuries, harms, and claims remain "important to a state policy." *Nitkewicz*, 49 F.4th at 729 (citation omitted). New York has a genuine interest in supporting "a social policy to facilitate free and vigorous participation in athletic activities, which have enormous social value," *Greiber v. Nat'l Collegiate Athletic Ass'n*, 244 N.Y.S.3d 591, 698–99 (2d Dep't 2025) (quoting *Annitto v. Smithtown Cent. Sch. Dist.*, 177 N.Y.S.3d 620, 623 (2d Dep't 2022)), and, relatedly, policing the risks faced by elite athletes within the State, *Cotty v. Town of Southampton*, 880 N.Y.S.2d 656, 659 (2d Dep't 2009), and by companies within its boundaries that market products used by athletes. New York likewise has a genuine interest in preserving distinctions among claims that bear on tort, contract, labeling, and fraud. The State therefore has an interest in clearly defining the scope of a business' liability in this

area. *See Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439, 450–51 (2013).

(3) "[H]aving disposed of [Asinga]'s other claims in a separate summary order," this case turns on the "unsettled and important issue[s] of state law" that resolve his strict liability, negligence, and negligent misrepresentation claims. *See Doe v. Guthrie Clinic, Ltd.*, 710 F.3d 492, 498 (2d Cir. 2013) (quotation marks omitted)). Deciding the certified questions is therefore "necessary to resolve this appeal." *E. Fork Funding LLC v. U.S. Bank, Nat'l Ass'n*, 118 F.4th 488, 498 (2d Cir. 2024).

Because this question is important to New York State and left unanswered by New York state courts, we certify it to the New York Court of Appeals. *See Georgitsi Realty, LLC v. Penn-Star Ins. Co.*, 702 F.3d 152, 158–59 (2d Cir. 2012).

We therefore **CERTIFY** the following questions to the New York Court of Appeals pursuant to our Local Rule 27.2 and 22 N.Y.C.R.R. § 500.27(a):

> (1) Does any doctrine of New York law bar a tort claim as duplicative of contract or products liability claims if there is no viable claim under contract or products liability?
>
> (2) Does the nonconsensual ingestion of a substance that affects eligibility to compete amount to an athlete's cognizable injury in tort, when consumed in reliance on a false representation that the product containing the substance had been independently tested for and certified as uncontaminated with that substance?

It is therefore **ORDERED** that the Clerk of this Court transmit to the Clerk of the Court of Appeals of the State of New York a Certificate, as set forth below, together with this opinion, a complete set of briefs and appendices, and the record filed in this Court by the parties. This panel retains its jurisdiction to decide this appeal once

we have had the benefit of the New York Court of Appeals' views, or it declines to accept certification.

**CERTIFICATE**

The foregoing is hereby certified to the Court of Appeals of the State of New York pursuant to Second Circuit Local Rule 27.2 and New York Codes, Rules, and Regulations Title 22, section 500.27(a), as ordered by the United States Court of Appeals for the Second Circuit.